1  THEODORE J. BOUTROUS, SBN 132099
     tboutrous@gibsondunn.com
2  MARCELLUS MCRAE, SBN 140308
     mmcrae@gibsondunn.com
3  GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
4  Los Angeles, CA 90071-3197
   Telephone: 213.229.7000
5  Facsimile: 213.229.7520

6  JOSHUA S. LIPSHUTZ, SBN 242557
     jlipshutz@gibsondunn.com
7  GIBSON, DUNN & CRUTCHER LLP
   555 Mission Street
8  San Francisco, CA 94105-0921
   Telephone: 415.393.8200
9  Facsimile: 415.393.8306

   Attorneys for Plaintiffs
10
                    UNITED STATES DISTRICT COURT
11
                   CENTRAL DISTRICT OF CALIFORNIA
12
                           WESTERN DIVISION
13

14 APRIL BAIN; BHAVINI BHAKTA;        CASE NO. 2:15-CV-2465-SVW-AJW
   CLARE SOBETSKI,
15                                    **FIRST AMENDED COMPLAINT**
                  Plaintiffs,
16
          v.
17
   CALIFORNIA TEACHERS
18 ASSOCIATION; NATIONAL
   EDUCATION ASSOCIATION;
19 CALIFORNIA FEDERATION OF
   TEACHERS; AMERICAN
20 FEDERATION OF TEACHERS;
   UNITED TEACHERS LOS
21 ANGELES; UNITED TEACHERS OF
   RICHMOND CTA/NEA; RAMON
22 CORTINES, in his capacity as
   Superintendent of Los Angeles Unified
23 School District; BRUCE HARTER, in
   his capacity as Superintendent of West
24 Contra Costa Unified School District;
   DAVID VANNASDALL, in his
25 capacity as Superintendent of Arcadia
   Unified School District,
26
                  Defendants.
27

28

Plaintiffs April Bain, Bhavini Bhakta, and Clare Sobetski, by and through their undersigned counsel, hereby allege as follows:

## I.     PRELIMINARY STATEMENT

1.     "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  These ten words of the First Amendment bestow upon Americans one of the most cherished civil rights and protect "our profound national commitment to the free exchange of ideas."  *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002).

2.     As part of protecting the right to free speech, the First Amendment prevents an individual from being "compelled to subsidize speech by a third party that he or she does not wish to support."  *Harris v. Quinn*, 134 S. Ct. 2618, 2644 (2014).  Thus, teachers, like all other public employees in the United States, may not be "forced to support financially an organization with whose principles and demands he may disagree."  *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2289 (2012).

3.     Unfortunately, California teachers who wish to exercise their First Amendment rights face significant adverse consequences if they do—they are stripped of important employment-related benefits and denied the right to vote in employment-related matters.  This lawsuit seeks to remedy this extreme injustice to California's educators, so that teachers can enjoy the same First Amendment rights as other Americans without being punished for exercising them.

## II.     INTRODUCTION

4.     The State of California ("State") and its public school districts, in cooperation with the California Teachers Association ("CTA"), California Federation of Teachers ("CFT"), and local teachers unions throughout the state, compel all teachers, including Plaintiffs, to make financial contributions to teachers' unions as a condition of public employment.  This arrangement is established and maintained under color of State law, the California Educational Employment Relations Act ("EERA"), Cal. Gov't Code § 3540, *et seq*.

5.     Each year, the teachers' unions estimate a breakdown of expenditures that they deem to be related to collective bargaining on behalf of teachers ("chargeable") and those expenditures that are not related to collective bargaining ("non-chargeable"). The category of "non-chargeable" expenditures is a bundle of expenditures that includes political or ideological spending, but also includes other expenditures that provide employment-related benefits to teachers.

6.     All teachers are required to contribute to the unions' "chargeable" expenditures.[1]

7.     Teachers who wish to exercise their First Amendment right to refrain from contributing to the unions' political and ideological activities are allowed to do so, but only if they opt out of all of the "non-chargeable" expenditures—a bundle that includes not only dues pertaining to political and ideological expenditures, but also dues that pay for certain important employment-related benefits.  The State and the teachers' unions do not allow teachers to opt out only of the unions' political and ideological expenditures.

8.     In addition, those teachers who opt out of the "non-chargeable" expenditures are stripped of their union membership and become "non-members" of the union.  The State and the teachers' unions do not allow teachers to remain union members *and* exercise their First Amendment right to avoid contributing to the unions' political or ideological activities.  *See* Cal. Gov't Code § 3546 (teachers "shall, as a condition of continued employment, be required *either* to join the recognized employee organization *or* pay the fair share service fee") (emphasis added); *see also* Ex. A, at 1 (CTA *Hudson* Notice) ("As an agency fee payer, you **are not** a member of your Association") (emphasis in original).

---

[1] Plaintiffs do not object to paying the "chargeable" portion of dues as a condition of union membership and do not contend that any portion of the "chargeable" dues is political or ideological in nature.

9.     Teachers who wish to remain members of their unions and who wish to receive all of the employment-related benefits that union members receive *must* contribute to both the unions' "chargeable" and "non-chargeable" expenditures.  In other words, every teacher who is a union member and every teacher who wishes to receive certain employment-related benefits is forced to fund the unions' political and ideological activities.

10.     Losing union membership has significant adverse consequences for a teacher.  By becoming a non-member, a teacher is forced to give up important employment-related benefits that the unions bundle with their political and ideological expenditures, and that they make available only to union members.  For example, a non-member teacher is forced to forgo the ability to participate in the unions' disability insurance program (including insurance that is necessary for full maternity-leave compensation), legal representation in cases of employment disputes, death and dismemberment compensation, and disaster relief, among many other benefits.

11.     The teachers' unions have an obligation to "fairly and equitably represent all [teachers] regardless of union membership." *Harris*, 134 S. Ct. at 2631; *Wagner v. Prof. Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1038 (9th Cir. 2004).  And the State has a responsibility to ensure that obligation is met. *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 221 & n.15 (1977); Cal Gov't Code § 3515.7.  As the Attorney General of California recently informed the U.S. Supreme Court, the union's duty to represent *all* teachers, whether members or not, is "'inseparable from the power of representation conferred upon it'" by the State.  Br. of the Attorney Gen. of Cal. in Opp. to Cert., *Friedrichs v. Cal. Teachers Ass'n*, No. 14-95, at 2 (U.S. May 27, 2015) (quoting *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 204 (1944)).

12.     Nevertheless, the unions take advantage of their State-conferred exclusive bargaining status and other state laws to ensure that certain employment-related benefits are *not* provided by the employer.  Notwithstanding their obligation to represent *all* teachers, the unions make these employment-related benefits available

4

only to their members, and *not* available to non-members, so that teachers are deterred from (and penalized for) exercising their First Amendment right to opt out of contributing to the unions' political and ideological expenditures.

13.     Because the State confers upon unions the exclusive authority to engage in collective bargaining on behalf of teachers, a teacher who does not wish to fund the unions' political or ideological agenda has no other entity that can negotiate on her behalf to secure these employment-related benefits.

14.     In addition, by becoming a non-member, a teacher is forced to give up her ability to vote in elections that determine the union's leadership and its collective bargaining position.  Non-members are also prevented from voting on employment-related matters, such as whether to adopt the collective bargaining agreement that determines the terms of teachers' employment.

15.     Because of these substantial employment-related benefits and voting rights that are available only to union members, many teachers who do not wish to contribute to the unions' political or ideological activities are effectively compelled to abandon their First Amendment rights and contribute to those political or ideological activities so that they can join (or remain members of) the unions.  By authorizing unions to bundle employment-related benefits and voting rights together with political and ideological activities, thereby punishing teachers for—and deterring teachers from—exercising their First Amendment rights, the arrangement established by California law violates the First Amendment.

16.     Plaintiffs are public school teachers who wish to retain the employment-related benefits and voting rights that come with union membership, but also wish to exercise their First Amendment right to avoid contributing to the unions' political or ideological activities.  They are willing to contribute to all of the costs of union membership, whether "chargeable" or "non-chargeable," with the exception of the unions' political and ideological expenditures.  They should not be forced to make the untenable choice of either (a) abandoning their First Amendment rights or (b)

abandoning the employment-related benefits and voting rights that the unions choose to secure—in their State-conferred capacity as exclusive bargaining representative on behalf of *all* teachers—only for their members.

17.    Plaintiffs respectfully request that this Court enjoin Defendants from enforcing this unconstitutional arrangement.

### III.    JURISDICTION AND VENUE

18.    This is an action under the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, to redress the deprivation, under color of state law, of rights, privileges and immunities secured to Plaintiffs by the Constitution of the United States, particularly the First and Fourteenth Amendments.

19.    This court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).  Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

20.    Venue is proper in this district under 28 U.S.C. § 1391(b).

21.    An actual controversy currently exists between the parties concerning the constitutionality of California's teachers unions' ability to compel the collection of certain dues from teachers under California law, and their provision of unequal benefits and voting rights based on teachers' willingness to contribute to the unions' political and ideological activities.  That controversy is justiciable in character, and relief is necessary to and capable of preserving Plaintiffs' rights and preventing future harm to Plaintiffs.

22.    California law and the teachers' unions operating under that law impose a cognizable injury on Plaintiffs by forcing them to forgo important employment-related benefits and voting rights in order to exercise their First Amendment right to refrain from contributing to the unions' political and ideological expenditures, thereby punishing Plaintiffs for exercising their First Amendment rights.

## IV.   PARTIES

23.     Plaintiff April Bain is a teacher in the Los Angeles Unified School District.  She is a dues-paying member of United Teachers Los Angeles ("UTLA"), the CFT, and the American Federation of Teachers ("AFT"), and would like to remain a member of those unions.  Ms. Bain does not wish to contribute to the unions' political or ideological expenditures, but she feels compelled to do so because she does not wish to forgo the various employment-related benefits and voting rights that come with union membership.  On January 26, 2015, Ms. Bain sent a letter to the UTLA Chapter Vice Chair at the Downtown Magnets High School requesting that she be allowed to remain a union member without contributing to the unions' political and ideological expenditures.  On February 6, 2015, the UTLA Chapter Vice Chair at the Downtown Magnets High School responded that such an arrangement was not permitted and informed Ms. Bain that she must become a non-member in order to avoid paying the "non-chargeable" portion of dues.

24.     Plaintiff Bhavini Bhakta is a teacher in the Arcadia Unified School District.  She is a dues-paying member of Arcadia Teachers Association ("ATA"), the CTA, and the National Education Association ("NEA"), and would like to remain a member of those unions.  Ms. Bhakta does not wish to contribute to the political or ideological expenditures of the CTA or the NEA, but she feels compelled to do so because she does not wish to forgo the various employment-related benefits and voting rights that come with union membership.  Ms. Bhakta informed officials at ATA of her intention to remain a union member without paying the political and ideological portion of her CTA and NEA dues, but under California law and union rules, she is not allowed to do so.

25.     Plaintiff Clare Sobetski is a teacher in the West Contra Costa Unified School District and a Union Representative at Richmond High School.  She is a dues-paying member of United Teachers of Richmond CTA/NEA ("UTR"), the CTA, and the NEA, and would like to remain a member of those unions.  Ms. Sobetski does not

wish to contribute to the unions' political or ideological expenditures, but she feels compelled to do so because she does not wish to forgo the various employment-related benefits and voting rights that come with union membership.  On February 5, 2015, Ms. Sobetski sent a letter to the President of UTR requesting that she be allowed to remain a union member without contributing to the political and ideological portion of union dues.  On February 5, 2015, the President of UTR responded that such an arrangement was not permitted and informed Ms. Sobetski that she must become a non-member in order to avoid paying the "non-chargeable" portion of dues.

26.    Defendant National Education Association, with three million members, is the nation's largest teachers' union and one of the largest public-sector unions in the United States.  It receives a share of the dues that Plaintiffs and other public-school teachers are required to contribute under California's forced dues arrangement.  It has annual revenues of over $400 million.  The NEA is a major participant in political activities at the national, state, and local levels.

27.    Defendant American Federation of Teachers has 1.6 million members and is the nation's second-largest teachers' union.  It receives a share of the dues that Plaintiffs and other public school teachers are required to contribute under California's forced dues arrangement.  It has annual revenues of approximately $320 million.  The AFT is a major participant in political activities at the national, state, and local levels.

28.    Defendant California Teachers Association is the state affiliate of the NEA.  With 325,000 members, it is the largest teachers' union in California and one of the largest public-sector unions in the United States.  It receives a share of the dues that Plaintiffs and other public-school teachers are required to contribute under California's forced dues arrangement.  It has annual revenues of over $175 million.  The CTA is a major participant in California politics and is active at all levels of state and local government.

29.    Defendant California Federation of Teachers is the state affiliate of the AFT.  It has 120,000 members and is the second-largest teachers' union in California.

1    It receives a share of the dues that Plaintiffs and other public school teachers are
2    required to contribute under California's forced dues arrangement.  It has annual
3    revenues of approximately $24 million.  The CFT is a major participant in California
4    politics and is active at all levels of state and local government.

5         30.    Defendant UTLA is the local union that is recognized as the exclusive
6    bargaining representative in the Los Angeles Unified School District.  It is affiliated
7    with both CTA and CFT at the state level and both NEA and AFT at the national level.

8         31.    Defendant UTR is the local union that is recognized as the exclusive
9    bargaining representative in the West Contra Costa Unified School District.  Its state
10   affiliate is the CTA and its national affiliate is the NEA.

11        32.    Defendant school superintendents are the executive officers in charge of
12   the school districts that employ Plaintiffs, pay Plaintiffs' wages, and process all
13   deductions from Plaintiffs' paychecks, including deductions for union dues pursuant to
14   State law.  Cal. Gov't Code §§ 3502.5, 3540 *et seq.*; Cal. Educ. Code §§ 45060, 45061,
15   45061.5, 45168.  Defendant school superintendents are sued in their official capacity.

16        33.    Defendant Ramon Cortines is the superintendent of the Los Angeles
17   Unified School District, and is the executive officer who implements the deduction of
18   union dues from the paychecks of Plaintiff April Bain.

19        34.    Defendant Bruce Harter is the superintendent of the West Contra Costa
20   Unified School District, and is the executive officer who implements the deduction of
21   union dues from the paychecks of Plaintiff Clare Sobetski.

22        35.    Defendant David Vannasdall is the superintendent of the Arcadia Unified
23   School District, and is the executive officer who implements the deduction of union
24   dues from the paychecks of Plaintiff Bhavini Bhakta.

25        36.    Nonparty ATA is the local union that is recognized as the exclusive
26   bargaining representative in the Arcadia Unified School District.  Its state affiliate is
27   the CTA and its national affiliate is the NEA.

28

## V.    FACTUAL ALLEGATIONS

### I.    **Statutory Framework**

37.    Under California law, a union may become the exclusive bargaining representative for "public school employees" in a bargaining unit (usually a public school district) by submitting adequate proof that a majority of such employees in the unit wish to be represented exclusively by the union.  Cal. Gov't Code §§ 3544, 3544.1.  The statute defines "public school employee" for these purposes as "a person employed by a public school employer except persons elected by popular vote, persons appointed by the Governor of this state, management employees, and confidential employees [who facilitate employee relations on behalf of management]."  *Id.* § 3540.1(j).  When a union is designated as the exclusive representative, all the "public school employees" in that district are represented exclusively by the union for purposes of bargaining with the district over the terms and conditions of employment. *Id.* § 3543.1(a).  The union has an obligation to "fairly represent each and every employee" in all matters that are the subject of collective bargaining.  *Id.* § 3544.9.

38.    California law defines the terms and conditions of employment, concerning which the unions may collectively bargain, to include wages, hours of employment, health and welfare benefits, leave, transfer and reassignment policies, safety conditions of employment, class size, procedures to be used for the evaluation of employees, and procedures to be used for processing grievances, among others.  *Id.* § 3543.2(a).

39.    California defines "health and welfare benefits" as "any one or more of the following:  hospital, medical, surgical, disability, legal expense or related benefits including, but not limited to, medical, dental, life, legal expense, and income protection insurance benefits, whether provided on an insurance or a service basis, and includes group life insurance[.]"  *Id.* § 53200.

40.    Under California law, a union that has been recognized as the exclusive bargaining representative for a school district can enter into an agency-shop

10

arrangement (also known as an "organizational security agreement") with that district. Teachers in that district are then put to a choice, as a condition of their employment: either (1) become a member of the union and be forced to contribute to both the unions' "chargeable" and "non-chargeable" expenditures, including its political and ideological expenditures, or (2) become a non-member of the union and be forced to contribute only to the union's "chargeable" expenditures. *Id.* § 3546(a); *see also* Ex. B, art. IV-A, § 4.1 (excerpts of Collective Bargaining Agreement between Los Angeles Unified School District and UTLA); Ex. C, art. 8, § 2 (excerpts of Collective Bargaining Agreement between West Contra Costa Unified School District and UTR); Ex. D, art. XVII, § 17.2 (excerpts of Collective Bargaining Agreement between Arcadia Unified School District and ATA).

41.     Each year, the union must send to non-members (but not to members) a "*Hudson* Notice" indicating the percentage of the agency fees that will be "non-chargeable" and providing non-members instructions on how to opt out of that portion of union dues.

42.     Teachers who are members of the union cannot opt out of paying the portion of union dues that is spent on political or ideological expenditures, which is included within the "non-chargeable" category.  School districts collect the full amount of union dues from those teachers through automatic payroll deductions and forward them to the unions.  *Id.* § 3543.1(d); *see also* Cal. Educ. Code §§ 45060, 45061, 45061.5, 45168.

## II.     Benefits Available Only To Union Members

43.     Numerous employment-related benefits are conditioned on a teacher giving up her First Amendment rights and becoming, or remaining, a member of the unions.  Leaving the union, or refusing to join it, requires a teacher to give up these important employment-related benefits.

44.    For example, most teachers in California are unable to obtain certain disability insurance benefits as part of their employment package.[2]  Such insurance is necessary to, among other things, provide teachers on maternity leave with funds approximating their regular salary.  Under California law, a teacher who takes a leave of absence or disability is only guaranteed full-time pay for the number of sick days he or she has available.  Cal. Educ. Code § 44977(a).  Once sick pay is exhausted, he or she will continue to receive compensation for up to five months in an amount equal to either: (1) the difference between the teacher's full-time pay and the pay to a substitute teacher, *id.* § 44977; or, (2) if a district adopts such a policy, 50 percent or more of his or her regular salary (according to district policy).  *Id.* § 44983.  Most school districts have selected the first option:  They provide only differential pay during disability leave (including maternity leave), leaving disability insurance to make up the difference.[3]

45.    Most school districts do not participate in California's State Disability Insurance (SDI) or Paid Family Leave (PFL) programs.  Thus, most California teachers do not receive access to this program, even though approximately 13.1 million other California workers (*i.e.*, most other workers in the state) are covered by the programs.  California Unemployment Insurance Code § 710.4 gives teachers' unions a veto over allowing school districts to participate in the SDI and PFL programs by providing that such participation must be "the result of a negotiated agreement between the public school employer and the certified employee organization."

46.    Instead of negotiating with districts to participate in the SDI and PFL programs or otherwise provide better disability insurance and maternity benefits for all teachers, the unions have opted themselves to provide teachers with access to such

_____

[2]  Ex. E, at 1-4 (CTA Member Benefits); Ex. F, at 1-4 (AFT Member Benefits).

[3]  Ex. E, at 3-5 (CTA Member Benefits).

disability insurance and maternity benefits, but only to their members who also contribute to their political and ideological expenditures.

47. The CTA provides free legal representation in employment disputes, but it does so exclusively to union members. Every CTA member is covered by "Educators Employment Liability Insurance" at no additional cost, which provides up to $1,000,000 coverage for legal defense costs in civil suits "arising out of education employment activities," and up to $35,000 for attorney fees and costs arising out of "employment-related criminal proceedings." Non-members of the union are not eligible to receive these services.[4] CTA members also "have the right to be fairly represented by [their] local association in matters arising under the collective bargaining contract" through the CTA's "Group Legal Services Program." Through this program, CTA pays attorneys' fees and costs in order to provide "high quality employment related legal services to CTA members and chapters to ensure that their contractual, statutory, and constitutional rights are protected." Specifically, the CTA provides:

- Up to $20,000 for expenses incurred during proceedings in front of the Commission on Professional Competence (CPC);
- Up to $7,000 incurred during an appeal of a CPC decision, if the CPC decides that the member should not be dismissed;
- Up to $5,000 for dismissals made during district-wide layoffs ("Reductions-in-Force");
- Up to $4,000 for a "credential review";
- Up to $5,000 to appeal a decision by the California State Teachers Retirement System ("CalSTRS") that a member is ineligible to receive disability payments from CalSTRS; and,

---

[4] *Id*. at 1, 6-10.

- Between one and three hours of legal advice related to, among other things, "temporary" teacher dismissal or probationary non-reelection.

In addition, the CTA's chief counsel may authorize discretionary funding and representation for other employment related matters in "precedential or especially significant cases not covered above." Non-members of the union are not eligible to receive any of these services. In practice, this legal representation makes it substantially more difficult for a school district to take adverse employment actions against a union member teacher than a non-member teacher.

48. The AFT also makes legal representation in employment disputes conditional on union membership. The AFT allows local affiliates to opt into the AFT Occupational Liability Insurance Policy, which provides up to $1,000,000 per member for civil defense costs in work-related suits. Local affiliates may also opt into the AFT Legal Action Trust, which provides up to $35,000 per member in criminal defense costs when the member is completely exonerated and up to $5,000 when the member is not completely exonerated. These services are provided to AFT members at no additional cost. Non-members of the union are not eligible to receive these services.[5]

49. The CTA also offers life insurance to its members, but not to non-members.[6] And it provides death and dismemberment benefits to CTA members at no cost. Under this program, CTA members (or their beneficiaries) who die or suffer dismemberment (that is, loss of a limb or other "qualifying injury") receive:

- up to $2,000 of death benefits;
- up to $10,000 of accidental death and dismemberment benefits; and/or,
- up to $50,000 if the member dies or suffers dismemberment "due to an accident or assault while engaged in any activity which was in the expressed or implied

---

[5] Ex. F, at 5 (AFT Member Benefits); Ex. G, at 1 (CFT Member Benefits).

[6] Ex. E, at 1, 11-15 (CTA Member Benefits).

14

terms of his or her occupation, or while acting in the capacity of an Association Leader."

50.    The NEA also provides members-only life insurance.[7]  As the NEA acknowledges, "even if your school district provides [life insurance] coverage, it may not be adequate."  Rather than negotiate with school districts to provide adequate coverage to teachers, the NEA has chosen to provide insurance itself, exclusively to members.  New NEA members receive $15,000 of complimentary life insurance for one year.  NEA members are then eligible for $1,000 of term life coverage and $5,000 of accidental death and dismemberment coverage at no cost, or they can opt into more comprehensive coverage, anywhere from $25,000 to $500,000.

51.    The AFT similarly provides life insurance exclusively to its members.  A "specially-negotiated group term life insurance plan . . . [provides] AFT members and their spouses" with $1,000,000 in benefits to supplement existing coverage.  In addition, new AFT members receive $10,000 free life insurance "[a]s a unique benefit to becoming a new member of AFT[.]"  AFT also provides access to term life insurance coverage for senior teachers, so long as they are active or retired union members.  And it offers AFT members access to an emergency medical assistance plan that covers transportation and medical care.[8]

52.    The CTA has established a separate fund that provides financial assistance to members who have experienced "significant losses due to disasters in California," including up to $1,500 for "significant economic hardship related to damage to their primary residence," and another $1,500 if damages exceed $50,000.  The program is available to CTA members at no cost.[9]

---

[7]  Ex H, at 1-7 (NEA Member Benefits).

[8]  Ex. F, at 6-17 (AFT Member Benefits).

[9]  Ex. E, at 16-17 (CTA Member Benefits).

53.     The unions provide these employment-related benefits directly so that they can provide them exclusively to their members, instead of bargaining with the employer school districts to make them available to all teachers.  And the unions tout these benefits to deter teachers from exercising their First Amendment right to avoid contributing to the unions' political and ideological expenditures.  By withholding these benefits from non-members, the unions, under color of state law, punish teachers for refusing to contribute to the unions' political and ideological expenditures.

54.     For example, CTA's *Hudson* Notice informs teachers who have exercised their First Amendment right to opt out of the unions' political and ideological expenditures as follows:  "As an agency fee payer, you are not a member of your Association and do not have access to all the rights and benefits that come with membership. . . .  You may become a full member of the Association and pay full unified dues to NEA/CTA/Local Association, and take advantage of all rights and benefits that come with membership.  Members may vote for Association officers, are covered under the $1,000,000 Educators Employment Liability coverage, have full access to the legal representation provided under CTA's Group Legal Services Program, and are eligible for CTA-sponsored insurance programs and many other valuable membership benefits."[10]  "We believe active membership is the best way to protect your employment interests . . . ."[11]

55.     Similarly, the mailer that UTLA sends to new LAUSD teachers lists fourteen benefits available only to members, including "[l]egal services for dismissals/layoffs," "[v]oting on negotiated changes to the contract," "[a]ccidental death insurance policy," "$1 million job liability insurance," and "[i]nvolvement in

---

[10]  Ex. A, at 1 (CTA *Hudson* Notice).

[11]  *Id*. at 4.

1  UTLA policy-making and governance; voting power." UTLA touts these benefits as
2  the reason why "Being a Member Just Makes Sense."[12]

3       56.    CTA even trains chapter leaders on "how to . . . make the most of the
4  numerous benefits provided exclusively to CTA and NEA members . . . , [and] use
5  member benefits . . . [to] convert agency-fee payers to members[.]"[13]

6       57.    Moreover, the CTA has plans to *expand* the disparity between benefits
7  available to union members and non-members by "enhanc[ing]" the CTA's "present
8  member benefits offerings."[14]

9       58.    If a teacher wishes to exercise her First Amendment right to refrain from
10  contributing to the unions' political or ideological expenditures, she must also forgo
11  the ability to vote on employment-related matters, including the terms and conditions
12  of her own employment. The unions prohibit non-members from voting on matters
13  that directly implicate collective bargaining interests, even though non-members
14  continue to contribute to the unions' collective bargaining-related expenditures. For
15  example, under the United Teachers of Los Angeles Constitution, only members are
16  permitted to vote on "matters submitted to membership"—including the ratification of
17  a collective bargaining contract.[15] Defendant unions tout this ability to influence the
18  terms and conditions of one's employment to deter teachers from exercising their First
19  Amendment right to opt out of the unions' political and ideological expenditures.[16]

20  **III.   The State Of California Authorizes And Facilitates The Unions' Coercion**

21       59.    The Supreme Court has held that a State violates the First Amendment
22  when it establishes an employment arrangement whereby public employees, including

24  [12] Ex. I, at 1 (UTLA New Teacher Brochure).
25  [13] Ex. J, at 2 (California Educator May 2012).
26  [14] Ex. K, at 18 (CTA Fair Share Presentation).
27  [15] Ex. L, arts. II § 1(b)(3)(c)(1), XV (UTLA Constitution).
28  [16] Ex. M (UTLA Member Benefits); Ex. N (UTR Member Benefits).

teachers, are forced to give money to political causes to which they object, including political and ideological expenditures of a union.  *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977).

60.    California has enacted a system that foreseeably and predictably allows and facilitates the teachers' unions to effectively coerce teachers into contributing to the unions' political and ideological expenditures.  The State is, or should be, aware that teachers' unions do in fact exercise this type of coercion over teachers.

61.    The unions achieve this coercion, at least in part, by bundling: (a) a teacher's obligation to contribute to the unions' political and ideological expenditures together with (b) the teacher's ability to access important employment-related benefits, and (c) the teacher's ability to participate in the process of selecting bargaining representatives and approving the collective bargaining agreement that will govern their employment.  And despite the State's obligation to ensure that the unions fairly and equitably negotiate on behalf of all teachers, regardless of union membership, the State allows and facilitates the unions' provision of important employment-related benefits and voting rights exclusively to members who contribute to the unions' political and ideological expenditures.

62.    State law empowers a union to become the exclusive bargaining representative for teachers in a district.  Cal. Gov't Code §§ 3544, 3544.1.  The State provides that *all* teachers in the district will be represented exclusively by that union, *id.* § 3543.1(a), a duty that is inseparable from the union's state-conferred power of representation.  *See Anaheim Elementary Educ. Ass'n v. Bd. of Educ.*, 225 Cal. Rptr. 468, 471 (Cal. Ct. App. 1986).

63.    State law also authorizes teachers' unions to enter into agency-shop agreements with local school districts.  *Id.* § 3546(a).

64.    The State also determines which matters shall be the subject of collective bargaining—namely, the terms and conditions of employment.  *Id.* §§ 3544.1.  The State defines "terms and conditions of employment" to include, *inter alia*, "health and

1  welfare benefits" and "procedures for processing grievances."  *Id.* § 3543.2.  And the

2  State defines "health and welfare benefits" to include "disability" benefits, "legal

3  expense or related benefits," and "life . . . insurance," among others.  *Id.* § 53200.

4      65.    The State, operating through its local school districts, has entered into

5  collective bargaining agreements with the unions providing that teachers in those

6  districts must choose between:  (1) becoming a member of the union and paying full

7  dues, including contributions to the unions' political and ideological expenditures, or

8  (2) leaving the union and giving up the ability to access members-only employment-

9  related benefits and the ability to vote in elections on union leadership and collective

10 bargaining agreements.  Ex. B, art. IV-A, §§ 4.0 & 4.1 (excerpts of Collective

11 Bargaining Agreement between Los Angeles Unified School District and UTLA); Ex.

12 C, art. 8, § 2 (excerpts of Collective Bargaining Agreement between West Contra

13 Costa Unified School District and UTR); Ex. D, art. XVII, § 17.2 (excerpts of

14 Collective Bargaining Agreement between Arcadia Unified School District and ATA).

15     66.    The State, operating through its local school districts, deducts from the

16 paychecks of every teacher in those districts who is *not* a union member a fee for the

17 unions' "chargeable" expenditures, and gives those fees to the unions for purposes of

18 collective bargaining.  *See Davenport v. Wash. Educ. Ass'n*, 132 S. Ct. 2372, 2380

19 (2007) ("The fees are in the union's possession only because [the State] and its union-

20 contracting government agencies have compelled their employees to pay those fees.").

21     67.    The State, operating through its local school districts, deducts from the

22 paychecks of every teacher in those districts who *is* a union member the full amount of

23 union dues, including both the "chargeable" and "non-chargeable" expenditures, and

24 gives those dues to the unions, irrespective of whether the teacher wishes to contribute

25 to the unions' political and ideological expenditures.

26     68.    State law allows and facilitates the unions' ability to lump important

27 employment-related benefits into the "non-chargeable" category, thereby bundling

28 them with political and ideological dues so that they will be available only to union

members who contribute to the unions' political and ideological expenditures.  And the unions engage in precisely this behavior.

69.    Disability benefits are one example.  Under California law, disability benefits are subject to collective bargaining.  Cal. Gov't Code §§ 3543.2, 53200.  More than 13.1 million California workers are provided with disability protection through the State's SDI and PFL programs.  State law, however, explicitly exempts public school teachers from the protections of those programs, instead giving teachers' unions the power to negotiate with school districts over teachers' inclusion in the State's SDI and PFL programs.  *See* Cal. Unemployment Ins. Code § 710.4.  These laws effectively give the unions a veto over teachers' participation in the SDI and PFL programs.  And rather than negotiate for teachers' inclusion in those programs, or for comparable disability benefits for teachers, the unions in most school districts have chosen to offer important disability insurance benefits exclusively to union members who contribute to the unions' political and ideological expenditures.

70.    Legal representation of teachers during adverse employment actions is another example.  Under California law, teachers' legal expenses and the procedures for processing grievances are subject to collective bargaining under Cal. Gov't Code §§ 3543.2, 53200.  The California Education Code, however, sets forth statutory procedures for dismissing permanent teachers, *see*, *e.g.*, Cal. Educ. Code §§ 44934, 44938, & 44944, thereby allowing the unions to avoid engaging in collective bargaining with respect to teacher dismissal.  And in fact, many collective bargaining agreements—including the agreements in force in Plaintiffs' school districts—do not address the process for dismissing permanent teachers under the California Education Code.  Because California law imposes on teachers' unions a duty of fair representation *only* in the areas of contract negotiations, contract enforcement, and contract-based grievances, *see* Cal. Gov't Code §§ 3544.9, 3515.7, the dismissal statutes enable and facilitate the unions' unequal treatment of non-members in defending against dismissal proceedings.  Rather than negotiate for teachers to be

appointed legal representation or to have their legal expenses covered in the event of statutory dismissal proceedings, the unions choose to offer legal representation exclusively to union members who contribute to the unions' political and ideological expenditures.

71.     Even beyond these two specific examples, the State, operating through its local school districts, repeatedly and consistently enters into collective bargaining agreements with teachers' unions in which certain employment-related benefits are not provided to teachers, enabling the unions to provide those benefits *only* to union member teachers who contribute to the unions' political and ideological expenditures.

## IV.     The Unions' Political And Ideological Expenditures

72.     As provided by state law, Cal. Gov't Code § 3540 *et seq.*, UTLA, UTR, and ATA have been designated the exclusive bargaining agents for the school districts in which Plaintiffs are employed as teachers.

73.     As provided by state law, *id.*, UTLA, UTR, and ATA have entered into agency-shop agreements with the school districts where Plaintiffs are employed as teachers.  These agreements include provisions requiring that all teachers in these districts either join the unions, or else pay agency fees to the unions.

74.     For each school district in which Plaintiffs are employed, the union dues are determined in collaboration with the CTA or CFT.  After the unions inform the school district of the annual union dues, the school district automatically deducts that amount in pro rata shares from the teachers' regular paychecks unless the teacher informs the district that he or she will pay the unions directly.  The school district sends the deducted amounts directly to the local union, which then distributes part of the dues to the CTA/NEA or the CFT/AFT.

75.     For each school district in which Plaintiffs are employed, the local union's dues includes "affiliate fees" for the CTA or the CFT, the state affiliates of the local union, and the NEA or the AFT, the national affiliates of the local union.  The affiliate fees are uniform in every school district because they are determined on a statewide

and nationwide basis by the CTA/NEA or the CFT/AFT.  The CTA/NEA or the CFT/AFT determine that part of those affiliate fees are "non-chargeable."  Non-members of the unions can opt out of paying the "non-chargeable" portion.  Union members cannot.

76.    Annual dues typically consume roughly two percent of a new teacher's salary, and sometimes increase regardless of whether there is an increase in teacher pay.  The total amount of annual dues generally exceeds $1,000 per teacher, while the amount of the refund received by non-members who opt out of the political portion of their agency fees is generally around $350 to $400.

77.    Dues and agency fees yield significant revenues for the unions.  For example, the CTA's revenue in 2011 was over $191 million, over $178 million of which came from membership dues and fees.  And the CFT's revenue in 2011 was over $24 million, over $22 million of which came from membership dues and fees.

78.    The CTA spent over $211 million in political expenditures from 2000 through 2009, topping the list of special interest groups in dollars spent to influence California voters and public officials.  Indeed, the CTA spent almost double the next special interest group on the list—another labor union—and more than the oil, tobacco, and pharmaceutical industries *combined*.

79.    The CTA's largest single expenditure, of over $26 million, was made to successfully oppose Proposition 38 on the 2000 ballot, which would have enacted a school-voucher system in California and thereby increased the potential employment pool for teachers.  In addition, the CTA spent $8.2 million opposing Proposition 74 on the 2005 ballot, which sought to extend the probationary period for public school teachers—a position that many teachers support.  The CTA spent over $60 million to oppose three attempts to eliminate automatic payroll deductions from teachers' paychecks.  And it has devoted substantial resources to opposing legislative and judicial efforts to eliminate a "last in, first out" layoff statute in the California

1   Education Code that has resulted in thousands of highly qualified and effective
2   teachers losing their jobs based solely on their lack of seniority.

3        80.    Each election cycle, the CTA spends millions of dollars on ballot
4   measures that are wholly unrelated to public education.  The CTA spent $20 million in
5   support of Propositions 79 and 80 on the 2005 ballot, which would have reduced the
6   costs of prescription drugs for low-income families and established government
7   regulation of electric service providers.  It spent $8.8 million in support of Proposition
8   24 on the 2010 ballot, which would have repealed corporate tax incentives, and $1.3
9   million in support of Proposition 25, which allowed legislators to adopt a budget with a
10  simple majority rather than a two-thirds vote.  In 2004, it spent $1.1 million in support
11  of Proposition 72, which would have required private-sector employers to provide
12  healthcare for their employees.

13       81.    The CTA's political donations go almost exclusively to the Democratic
14  Party, despite the fact that many teachers are registered Republicans or Independents.
15  From 2003 to 2012, the CTA spent nearly $102 million on political contributions, with
16  only 0.08 percent of that money going to Republicans.  Since 1986, the CTA has
17  donated $15.2 million directly to the California Democratic Party Committee,
18  compared to only $110,000 to the California Republican Party Committee.

19       82.    The CFT is also a major political spender in California.  For example, its
20  political action committee, the Committee on Public Education, spent $1.5 million on
21  candidates and ballot measures in 2013-2014 alone, including over $300,000 to
22  support incumbent State Superintendent of Public Instruction Tom Torlakson.  In
23  2005, the CFT spent nearly $2 million to oppose Proposition 75, which would have
24  eliminated automatic payroll deductions from teachers' paychecks, and nearly $1
25  million to oppose Proposition 74, which would have extended teachers' probationary
26  period.

27       83.    The CFT's largest expenditures are on ballot measures that have little or
28  nothing to do with public education.  In 2010, it spent nearly $3 million in support of

1  Proposition 25, which reversed the requirement that California legislators approve
2  budgets with a two-thirds majority.  The CFT's pro-Proposition 25 campaign included
3  a controversial video entitled "Tax the Rich: An Animated Fairy Tale" that depicted
4  "trickle down" economics as a rich person urinating on the poor.  In 2012, it spent
5  nearly $2 million in support of Proposition 30, which raised both sales and income
6  taxes.

7          84.    Like the CTA, the CFT's political contributions are almost entirely to the
8  Democratic Party.  One hundred percent of its donations to party committees have
9  gone to the California Democratic Party, and it has donated only $5,000 of millions to
10  measures with Republican filers.

11         85.    The national affiliates likewise collect sizeable dues from their members.
12  In 2009, for example, the NEA's revenue was $393 million, with $334 million derived
13  from membership dues and fees.

14         86.    The NEA engages in vast political spending.  In the 2014 election cycle
15  alone, the NEA and its affiliates spent $26.6 million in political contributions.  It spent
16  $14.8 million in the 2012 election cycle, contributing $2.3 million to Democratic
17  candidates, $177,707 to Republican candidates, and $12.5 million to political
18  organizations.  In addition, since 1998, it has spent $46.2 million lobbying public
19  officials.

20         87.    The NEA has spent large sums of money on various controversial
21  educational issues, supporting positions with which many teachers disagree.  For
22  example, the NEA and its affiliates spent $3.1 million in support of a 2007 Utah
23  referendum to overturn a statute authorizing school vouchers—a law that many
24  teachers supported because it would have increased the potential employment pool.
25  The NEA also donated $500,000 in support of a 2004 Washington referendum to
26  overturn a statute authorizing charter schools—another law with significant teacher
27  support.  And the NEA made a highly controversial $1.5 million donation in support of

28

a 2010 Oklahoma ballot provision, allegedly in violation of an Oklahoma law prohibiting donations from out-of-state political action committees.

88.     NEA's political advocacy spans a wide range of issues, including issues having little or nothing to do with education—for example, support for firearm restrictions and the Affordable Care Act.  It spent $3 million in support of a California tax increase in 2009 and $710,000 in support of an Ohio minimum wage increase in 2006.

89.     The AFT likewise engages in extensive political donations and lobbying. During the 2014 election cycle, the AFT and its affiliates spent $19.5 million in political contributions and over $1 million on lobbying efforts.  For example, it donated nearly $1 million to Chicago Mayor Rahm Emanuel's challenger—forcing Emanuel into a Democratic primary runoff—and $900,000 to the Democratic Governors Association.  And in 2012, it spent $10.2 million in political contributions and $1.3 million lobbying.

90.     Many of the AFT's expenditures are unrelated or only tangentially related to education.  Between 2009 and 2010, it donated $356,522 to the Economic Policy Institute, $100,000 to Health Care for America Now, $100,000 to the Center for Tax and Budget Accountability, $50,000 to the National Democratic Institute, $50,000 to Netroots Nation (a political convention for American progressive political activists), and $25,000 to the Center for American Progress.

91.     Plaintiffs wish to exercise their First Amendment right to refrain from contributing to the unions' political or ideological expenditures, many of which are contrary to Plaintiffs' own beliefs and/or directly harm Plaintiffs' own interests.  But Plaintiffs feel compelled not to exercise their First Amendment right because doing so would require them to forgo important employment-related benefits and voting rights. Plaintiffs wish to remain union members while contributing to all of the unions' expenditures *other* than the unions' political and ideological expenditures.  Plaintiffs wish to opt out of contributing to the unions' political and ideological expenditures

without being punished for doing so through the loss of their employment-related benefits and voting rights.

## COUNT I

**Punishing And Deterring The Exercise Of First Amendment Rights (U.S. Const.)**

92.     Plaintiffs incorporate and reallege each and every allegation contained in the foregoing paragraphs of this Complaint, as though fully set forth herein.

93.     The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the government for a redress of grievances." The Fourteenth Amendment to the United States Constitution incorporates the First Amendment's freedom-of-speech and freedom-to-petition protections against state intrusion, providing "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

94.     The First Amendment protections for freedom of speech and freedom to petition include the right not to speak and the right not to petition.

95.     Under color of California law, Cal. Gov't Code § 3540 *et seq.*, and being authorized and facilitated by the State, Defendant teachers' unions unconstitutionally force teachers who exercise their First Amendment rights to forgo important employment-related benefits and voting rights. Put differently, California teachers are deterred from, and punished for, exercising their First Amendment rights—stripped of their union membership and the important employment-related benefits that come with it. This arrangement violates teachers' constitutional rights under the First and Fourteenth Amendments to the United States Constitution.

96.     As required by California law, Defendant superintendents unconstitutionally deduct full union dues from the paychecks of teachers who are union members, even where the teachers do not wish to contribute to the unions'

political and ideological expenditures.  This arrangement violates teachers' constitutional rights under the First and Fourteenth Amendments to the United States Constitution.

97.     Plaintiffs have no adequate remedy at law for the future harm they will suffer if they must continue to contribute to their unions' political and ideological expenditures on pain of losing important employment-related benefits and voting rights.

## COUNT II

### Punishing And Deterring The Exercise Of Free Speech Rights (Cal. Const.)

98.     Plaintiffs incorporate and reallege each and every allegation contained in the foregoing paragraphs of this Complaint, as though fully set forth herein.

99.     The liberty of speech clause of the California Constitution provides that "[e]very person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right.  A law may not restrain or abridge liberty of speech or press."  Cal. Const., art. I, § 2(a).

100.    The California liberty of speech clause is broader and more protective than the free speech clause of the First Amendment.  *See Los Angeles Alliance For Survival v. City of Los Angeles*, 22 Cal. 4th 352, 366-67 (2000) (citing cases).

101.    Under color of California law, Cal. Gov't Code § 3540 *et seq.*, and being authorized and facilitated by the State, Defendant teachers' unions unconstitutionally force teachers who exercise their free speech rights to forgo important employment-related benefits and voting rights.  Put differently, California teachers are deterred from, and punished for, exercising their free speech rights—stripped of their union membership and the important employment-related benefits that come with it.  This arrangement violates teachers' constitutional rights under the California Constitution.

102.    As required by California law, Defendant superintendents unconstitutionally deduct full union dues from the paychecks of teachers who are union members, even where the teachers do not wish to contribute to the unions'

1  political and ideological expenditures.  This arrangement violates teachers'
2  constitutional rights under the California Constitution.

3       103.   Plaintiffs have no adequate remedy at law for the future harm they will
4  suffer if they must continue to contribute to their unions' political and ideological
5  expenditures on pain of losing important employment-related benefits and voting
6  rights.

7                          **COSTS AND ATTORNEYS' FEES**

8       104.   Pursuant to 42 U.S.C. § 1988, Cal. Civ. P. Code § 1021.5, and all
9  applicable provisions of law, Plaintiffs further seek an award of their costs, including
10 reasonable attorneys' fees, incurred in litigation of this case.

11                          **PRAYER FOR RELIEF**

12      An actual controversy has arisen between the parties entitling Plaintiffs to legal,
13 declaratory, and injunctive relief.

14      WHEREFORE, Plaintiffs pray that this Court:

15      (A)    Enter a judgment declaring that California's agency shop and collective
16 bargaining laws, codified in Cal. Gov't Code § 3540 *et seq.*, and other provisions of
17 California law described in this Complaint, impermissibly abridge Plaintiffs' First
18 Amendment and/or California constitutional rights insofar as they allow and facilitate
19 the ability of teachers' unions to force union members to make contributions to the
20 unions' political and ideological expenditures as a condition of union membership;

21      (B)    Enter a judgment declaring that California's agency shop laws, codified in
22 Cal. Gov't Code § 3540 *et seq.*, and other provisions of California law described in this
23 Complaint, impermissibly abridge Plaintiffs' First Amendment and/or California
24 constitutional rights insofar as they allow and facilitate the ability of teachers' unions
25 to force union members to make contributions to the unions' political and ideological
26 expenditures as a condition of receiving important employment-related benefits and
27 voting rights;

28

1    (C)    Enter a judgment declaring that California's agency shop laws, codified in

2    Cal. Gov't Code § 3540 *et seq.*, and other provisions of California law described in this

3    Complaint, impermissibly abridge Plaintiffs' First Amendment and/or California

4    constitutional rights insofar as they force school district superintendents to deduct from

5    teachers' paychecks union dues that support the unions' political and ideological

6    expenditures, even where those teachers do not wish to support the unions' political

7    and ideological expenditures;

8    (D)    Enter an injunction barring Defendant teachers' unions from denying

9    union membership, or any of its attendant voting rights or employment-related

10   benefits, to any individual on the basis of that individual's election not to make

11   contributions to the unions' political and ideological expenditures;

12   (E)    Enter an injunction barring Defendant superintendents from deducting

13   from teachers' paychecks the portion of union dues that supports the unions' political

14   and ideological expenditures where those teachers do not wish to support the unions'

15   political and ideological expenditures;

16   (F)    Grant Plaintiffs such additional or different relief as it deems just and

17   proper, including an award of reasonable attorneys' fees and the costs of this action.

18   Dated: June 15, 2015

19                                    THEODORE J. BOUTROUS
20                                    MARCELLUS MCRAE
                                      JOSHUA S. LIPSHUTZ
21                                    GIBSON, DUNN & CRUTCHER LLP

22
23                                    By:  */s/ Theodore J. Boutrous*
                                             Theodore J. Boutrous
24                                    Attorneys for Plaintiffs

25

26

27

28